## HOUSLEY v. STRAWN MERCHANDISE CO.
### (No. 9980.)

(Court of Civil Appeals of Texas. Ft. Worth.
April 14, 1923. Rehearing Denied
May 19, 1923.)

**1. Frauds, statute of ⟨⟩33(1)—Promise to pay another's debt, made to subserve promisor's own purposes, not within statute.**

Wherever the main purpose and object of the promisor is, not to answer for another, but to subserve some purpose of his own, his promise is not within the statute, though it may be in form a promise to pay the debt of another, and although the performance of it may incidentally have the effect of extinguishing the liability of another.

**2. Frauds, statute of ⟨⟩23(2)—Guaranty of account of contractor with materialman on condition that latter would furnish material to complete owner's buildings held not within statute.**

Where owner agreed to guarantee not only the future but past account of his contractor with a materialman, on condition that the materialman would furnish such additional material as was necessary to complete his buildings, and in so doing the owner's main purpose and intention was to subserve his own purpose and interest rather than to discharge the liability of his contractor, his promise was not within the statute.

**3. Frauds, statute of ⟨⟩159—Whether promise was to discharge another's liability or to subserve purposes of promisor held for the jury.**

In a case where the nature and effect of the promise relied on, whether made to discharge another's liability, or to subserve the purposes of the promisor, does not depend alone upon the terms and language used, the question is for the jury.

**4. Frauds, statute of ⟨⟩158(4)—Evidence held to support finding that promise to guarantee debt was to subserve promisor's own purpose, and to guarantee past as well as future indebtedness.**

·In materialman's action on owner's guaranty of contractor's indebtedness, evidence *held* to support finding, taking the promise out of the statute of frauds, that the promise was to subserve the owner's own purpose, · and was to guarantee past as well as future indebtedness; the use of the term "guarantee" not being conclusive that the agreement was within the ·statute.

**5. Account, action on ⟨⟩12—Verified denial of legal validity of account held not to render it inadmissible.**

Where verified denial of account of materialman by defendant owner did not deny the accuracy of the items but rather claimed that the account did not constitute a debt against such defendant under the statute of frauds, the account, which was verified, was not inadmissible because of the verified denial.

**6. Evidence ⟨⟩317(6)—Evidence as to value held not hearsay.**

In materialman's action for materials against owner and contractors, where the contractors, in cross-action, sued the owner for extra material and labor, testimony of one of the contractors as to the value of the extra material and labor was not inadmissible because resting in part on foreman's reports, where it appeared that the contractor was a contractor and expert builder with large experience and personally saw a part, if not all, of the changes made in construction and in the material furnished, thus qualifying him as an expert to give his opinion as to values entering into his account for extras, particularly where there was no testimony weakening his testimony.

Appeal· from District Court, Palo Pinto County; J. B. Keith, Judge.

Action by the Strawn Merchandise Company against J. H. Housley and others. From judgment for plaintiff, the named defendant appeals. Affirmed.

Chandler & Pannill, of Stephenville, and P. C. Sanders, of Strawn, for appellant.

Ritchie & Ranspot and Penix, Miller & Perkins, all of Mineral Wells, for appellee.

CONNER, C. J. The Strawn Merchandise Company, a corporation, instituted this suit on the 24th day of May, 1920, in the district court of Palo Pinto county against the appellant J. H. Housley and the appellees Moore & Co., a firm composed of J. B. Moore, Sr., and J. B. Moore, Jr., to recover an alleged balance due upon an itemized and verified account of $3,291.30. The plaintiff alleged that the defendant Housley was the owner of certain lots in the town of Strawn, Tex., and that at a time stated in 1919 he entered into a written contract with the said Moore & Co. for the erection of two· brick buildings on said property; that by the terms of the contract it was provided that Housley should pay for certain labor therein specified, and that Moore & Co. were to furnish all other material and labor and were to erect and complete said buildings in accordance with the contract and the plans and specifications made a part thereof; that the plaintiff sold and delivered the building material specified in the account and charged the same upon its books to "Moore & Co., Housley job"; that about the 9th day of September, 1919, the account which had been charged against Moore & Co. was in arrears, and the plaintiff refused to make further sales until verbally assured by the defendant Housley that he would see that the arrearages as well as all future deliveries of material would be paid for, whereupon · additional material as needed for the completion of the buildings had been furnished by the plaintiff, which thereafter looked to Housley for payment. It was alleged that

plaintiff was induced to so do by the promise and agreement of appellant to so pay, and also to forego the fixing of a statutory lien against the property to secure said indebtedness, which it was charged estopped the defendant Housley from a denial of the debt. The plaintiff further charged that said Housley had failed to require of Moore & Co. a bond for the protection and benefit of the plaintiff and other materialmen, as required by law, and by reason of such failure he became liable to pay said account. The plaintiff further alleged that soon after the beginning of the construction of said buildings by Moore & Co. the defendant Housley and said company, by mutual consent, rescinded the contract between them for the erection of said buildings whereby Housley became the principal and Moore & Co. but agents and servants of Housley, in consequence of which Housley became liable to pay the account.

The defendant Housley answered by general and special exceptions to the plaintiff's petition; by a general denial, and specially that the promise relied on by plaintiff was oral and in violation of the statute of frauds. Defendant Housley further pleaded by way of a cross-action against Moore & Co., alleging that he had at all times insisted upon the contract between them being carried out, but that before the completion of the buildings Moore & Co. abandoned the contract, and that the amounts expended by appellant in the completion of the buildings, together with amounts paid to Moore & Co., far exceeded the sum which appellant by contract agreed to pay Moore & Co. for the construction of the buildings. It was alleged that he had paid Moore & Co. for labor and material $14,047.32, and that it would require an additional sum of $385 to complete the buildings according to contract, and that Moore & Co. were indebted to him in the sum of $1,288.60, for which he sought a recovery against Moore & Co., and for such further sum, if any, as he might be held liable to pay the plaintiff, Strawn Merchandise Company.

Moore & Co. answered by a general demurrer, a general denial, and specially that soon after said buildings were begun that appellant made so many changes therein that they no longer acted under the contract but acted in the further erection of the buildings only as agents of the defendant Housley, whereby the alleged contract was abrogated; that materials sued for by the ·plaintiff were purchased by and on behalf of Housley by them as his agents, and for which Housley agreed to become responsible. Moore & Co. further alleged that for the extras supplied in making the specified changes Housley was indebted upon a balancing of accounts between them in the sum of $561.05, for which they prayed judgment.

The plaintiff by supplemental petition pleaded a general denial to the defendants' answers, and specially pleaded that at the time Housley agreed to pay the past indebtedness of Moore & Co. it had refused to sell further materials to Moore & Co., which was known to Housley, and that he thereupon represented to plaintiff that Moore & Co. had sufficient funds due them from the erection of said buildings to pay said account and promised that if plaintiff would furnish such additional material and carry said accounts until the completion of the buildings that appellant would guarantee to pay and would pay the amount that might remain due and unpaid on said account, and that in reliance upon such guaranty and promise the plaintiff did furnish the necessary additional materials whereby it was averred Housley was estopped to deny his promise and estopped to say that 'it was not binding on him because not in writing. The defendant Housley further denied under oath the account declared upon by the plaintiff in the following form, to wit:

"Now comes J. H. Housley, one of the defendants in the above entitled and numbered cause, and answering for himself alone would respectfully show that the account sued on by the plaintiff is not made by this defendant, and that the goods therein charged were not purchased by this defendant, and that this defendant is not liable thereon, and that said account is not the debt of this defendant, but is the debt of Moore & Co., a firm composed of J. B. Moore, Sr., and J. B. Moore, Jr., and that said account as to this defendant is not just or true either in whole or in part and this he is ready to verify."

The cause came on for trial on May 24, 1921, and the court, after having overruled the defendant Housley's demurrers and exceptions and a motion in his behalf for an instructed verdict after the conclusion of the evidence, submitted the cause to a jury upon special issues, which, together with the answers thereto, are as follows:

"(1) Did the defendant Housley agree with plaintiff's general manager, Mackey, on· or about the 20th day of September, 1919, that he would guarantee the future and present account of Moore & Co. which was then owing to the plaintiff for material which had been used in the erection of buildings for said Housley on condition that plaintiff would furnish Moore & Co. such additional material as necessary to complete the buildings in question? Ans. Yes.

"(2) Did the defendant Housley agree with the plaintiff's general manager, Mackey, on or about the 20th day of September, 1919, that he would guarantee the past-due account of Moore & Co. for material which Moore & Co. had purchased for the Housley buildings if plaintiff would furnish materials necessary to complete the buildings in question? Ans. Yes.

"(3) Was it or not the intention and main purpose of Housley when he guaranteed the account of Moore & Co. to plaintiff, if he did guarantee said account, to subserve his own

purpose and interest rather than to discharge and extinguish the liability of Moore & Co.? Ans. Yes.

"(4) What sum of money do you find from the evidence to be the agreed value of material bought of plaintiff by defendant Moore & Co. for the Housley buildings after September 20, 1919, to complete said buildings? Ans. $1,570.65.

"(5) If you find that the buildings in question are not complete in accordance with the contract between Housley and Moore & Co., then what sum of money do you find will furnish the labor and material necessary to complete same? Ans. $25.

"(6) What aggregated sum of money do you find that defendant Housley has paid in advance to Moore & Co. under the terms of the contract entered into between them and for and in behalf of the agreed changes made in the erection of said building? Ans. $13,433.60.

"(7) What sum of money do you find to be the reasonable value of materials and labor furnished by defendant Moore for the benefit of the defendant Housley to make the changes agreed upon in the construction of the buildings in question? Ans. $1,653.50.

"(8) Did the defendant Housley on or about September 20, 1919, agree with plaintiff's manager, Mackey, to guarantee only materials thereafter furnished Moore & Co. by plaintiff not to exceed the sum of $700? Ans. No.

"Special Requested Issue No. 4. Did plaintiff, Strawn Merchandise Company, forbear to take the necessary steps to fix or attempt to fix and to enforce a materialman's lien against the property in controversy for the amount of the unpaid balance due upon its account on September 20, 1919, in consequence of and in reliance upon defendant Housley's agreement to guarantee payment of the said amount if he did so agree? Ans. Yes.

"Special Requested Issue No. 5. After Moore & Co. entered upon the construction of the buildings in controversy, did defendant Housley or not take charge of the work of erecting said buildings and have same erected solely in accordance with his own orders and directions. Ans. Yes."

Upon the incoming of the verdict, the court rendered a judgment in favor of the plaintiff, Strawn Merchandise Company, against all defendants jointly and severally for the sum of $3,550, principal and interest, to the date of the judgment. The judgment further recited that it appeared to the court that the defendant Housley had paid his codefendants and for their account the sum of $694.90 less than the total amount due from him to them, not including the balance due the plaintiff, and that therefore in event the defendants J. B. Moore, Sr., and J. B. Moore, Jr., should pay off and satisfy the amount decreed to the plaintiff, then they should recover of the codefendant Housley said sum of $694.90, together with interest thereon at the rate of 6 per cent. per annum from February 1, 1920, for which execution might issue, but that in event the defendant Housley should pay off and satisfy the judgment in favor of the plaintiff, then said defendant Housley should have and recover of his codefendant, the Moores, any and all sums so paid by him to the plaintiff less said sum of $694.90. From the judgment so rendered, the defendant Housley alone has appealed.

The controlling question, presented in various forms by the assignments of error and propositions of appellant, is whether the promise of appellant Housley, upon which the appellee Strawn Merchandise Company relies, is in violation of the statute of frauds?

But few subjects, if any, in the law have occasioned a greater variety of discussion and determination than has arisen in the effort to construe the statute of frauds and properly apply thereto the circumstances in particular cases. The statute referred to, in so far as applicable in the present action, provides that—

"No action shall be brought in any of the courts in any of the following cases, unless the promise or agreement upon which such action shall be brought, or some memorandum thereof, shall be in writing and signed by the party to be charged therewith, or by some person by him thereunto lawfully authorized: * * *

"(2) To charge any person upon a promise to answer for the debt, default or miscarriage of another."

In the present case, briefly and substantially stated, the evidence shows that as alleged by the appellee the appellant Housley was the owner of certain lots located in Strawn, Tex., upon which he desired to erect two brick buildings. In furtherance of that end, he employed the building firm of Moore & Co., who, by the terms of the contract, were to furnish all materials and supply all labor, with certain exceptions not necessary to notice, for the contract price of $12,500, of which 80 per cent. of each week's estimate of material furnished and labor done was to be paid weekly. Moore & Co. contracted with the appellee corporation for building material intended for use in the construction of the buildings, for which Moore & Co., by the terms of its contract with appellee, were to pay each week in cash 80 per cent. of the prices charged for material used during that week. Pursuant to this arrangement, Moore & Co. obtained material and for several weeks only paid in cash the 80 per cent. to which appellee was entitled under its contract. After default in payments by Moore & Co. and after an indebtedness for material had accrued amounting to approximately $2,700, appellee's manager, a Mr. Mackey, directed the yard foreman to refuse further deliveries. What then occurred is thus detailed by Mr. Mackey, J. B. Moore, Sr., and appellant Housley. Mr. Mackey testified:

"We refused to deliver Moore & Co. any more material on this Housley job, about the 14th or 15th of September.

"Following that time I was called on by Mr. Moore and Mr. Housley at the store. I had not delivered a thing from the time I

stopped delivery of material on this job until
the time Mr. Housley and Mr. Moore called on
me. There was an agreement had there at that
time between me and Mr. Housley relative to
this account. As to what was said there at
that time, I will state that on that date, which
was September 20th, Mr. Moore came in and
told me he was going to give a thousand dol-
lars on the account at that time; they owed
between $2,700, and $2,800. He came in, with
Mr. Housley. He got a check from Mr. Hous-
ley for a thousand dollars on that date, but
while we were talking he told me, he says,
'Now, Mackey, I am going to pay you a thou-
sand dollars on this account, and I would like
for you not to bother me any more until the
job is completed.' 'Well,' I says, 'that will
leave you owing me between $1,700 and $1,800,
Mr. Moore, after you pay me the thousand dol-.
lars.' I says, 'How much more material will
it take to complete the job?' He says, 'it will
take $800 or $900 more, probably.' He was
just guessing at it. 'Well,' I said, 'that will run
the account up around $2,700.' I said, 'Mr.
Moore, the only way I can agree to let this ac-
count run on until the job is completed with-
out any more money on the account is for Mr.
Housley to guarantee the account.' I says,
'Mr. Housley, will you do that'? and he said,
'Yes.' He said, 'Mr. Moore has ample coming
to him to take care of everything.' I said,
'Very well, I won't bother you any more until
the job is completed,' and I didn't. Mr. Moore
was eliminated then and there from the trans-
action. We, however, for the sake of con-
venience, let the account go on the books just
like it was, 'Moore & Co., Housley job.'

"After that I mailed all the statements to Mr.
Housley, but made the account out Moore &
Co. just like we had always done. I would not
have furnished those additional materials ex-
cept for Mr. Housley's agreement. I would not
have furnished Moore any additional materials
except for Mr. Housley's agreement. * * *

"Following this agreement that I have tes-
tified about I furnished, I did not, after that,
make any further demand for payments until
the job was finished. * * *

"We did refrain from taking the steps nec-
essary to fix a lien on these buildings,- relying
upon this agreement with Mr. Housley. That
was why we didn't take any steps, because I
figured his word was good. I considered him
good for his word, and good for the money,
and that is why we didn't take it down in writ-
ing. Except for the agreement we would have
·given him written notice of all materials fur-
nished, and filed the account in the county
clerk's office to fix a lien."

J. B. Moore testified, in part:

"We saw Mr. Mackey at the store, there, and
as well as I can remember, the conversation
occurred right at the north door in the dry
goods department. I could not just say the
location in the building, but it was in the dry
goods department somewhere. Mr. Housley
and I went in together, and we were standing
close together during that conversation. All
of us were taking part in that· conversation
to a certain extent.

"I think the first thing that was said in that
conversation was that I told Mr. Mackey that
I would like to pay him a thousand dollars on

that bill, and get him to carry it until the job
was completed; that we could not pay by the
week; that it would be impossible to do that.
I had agreed to pay 80 per cent. by the week,
and that was the basis on which Housley was
to pay me; that is 80 per cent. of the labor
and material. If I remember right, Mr. Mackey
asked me how much material it would take to
finish the job; to give him an estimate on how
much I thought it would take to finish the job,
and I told him I thought it would be about $900.
He then said, 'There is just one way under
which I will furnish any more material on the
job, and that is for Mr. Housley to guarantee
the account.' He asked Housley if he would
do it. Mr. Housley said he would, 'that Moore
had plenty in the job to pay it,' and that
'Moore had considerable extras that had not
been settled for.' Mr. Housley made that
statement at that time. That thousand dollars
was paid to Mr. Mackey that day. Mr. Housley
and I left there together. We went from there
down to the bank on the same side of the street.
I reckon it is the Citizens' National Bank. I
don't think any further conversation occurred
between· us in regard to those matters."

Appellant Housley testified on this point:

"I could not say the exact date that this
occurred, but it was along some time, I guess,
along the latter part of September, just after
I advanced him the thousand dollar check to
pay the Strawn Merchandise Company for ma-
terial they claimed he owed them.

"As to when the first time was that I had
conversation with Mr. Mackey or any one rep-
resenting the Strawn Merchandise Company,
regarding this account, I will state that the
first thing I knew that Moore wasn't paying
his bill was when I met Mackey on the street
one day, and he says, 'Housley, I wish you
would see Moore, and see if you can't get him
to make a payment on his bill; it is getting big,'
and I told him the first time I saw Mr. Moore
I would tell him, and that I was paying him
every week for the material.

"Moore had made a statement to me about
one of those material bills; he brought one of
the bills to me. I said, 'Mr. Moore, this bill
is getting pretty big, are you paying your lum-
ber bill every week like you agreed to do?'
and he said, 'Yes, I am paying it every week.'
Moore says, 'I know I am getting behind down
there.' He said, 'This money I have been col-
lecting, I need it to pay the freight on other
material I shipped in here.' I said, 'Mr. Moore,
I think you ought to pay it.' He says, 'Well,
let's go up there and see Mr. Mackey,' and I
said, 'All right.' On our way up there, he said,
'Can you advance me a thousand dollars on
this building?' At that time I did not owe him
on that contract. I had paid on the Friday
night before that occurred. As we went up
there, I promised to advance him a thousand
dollars. We went on up and met Mr. Mackey.
Mr. Moore got to talking to him about the
account. Mr. Moore says, 'Mr. Mackey, I can
pay you a thousand dollars; will that be sat-
isfactory for a little while?' He says, 'I am
building a building at Ranger, and I don't get
paid there until I get the building half com-
pleted, and when I get paid there I will come
down here and settle up this bill.' Mr. Mackey
said, 'I will take the thousand dollars, but I

would like to have the rest of it,' and finally, after he got through, Mr. Moore said: 'Mr. Mackey, how about getting some lumber to finish the buildings? I haven't got enough to finish them.' Mr. Mackey says, 'How much will it take?' and he said, 'It will take something like $700 worth,' and he says, 'How about you furnishing me that lumber to finish that building?' When he made that statement, Mr. Mackey kinda stopped a minute, and in a few minutes he looked up and says, 'I will furnish you that amount of material if Mr. Housley will stand for it.' I thought about it this way: I had to have the building finished, and I made the remark to Mr. Mackey, I says, 'All right, I will stand for this lumber, and if you can't get it out of Moore, I will pay you.' I did not agree to pay what Moore was behind to Mr. Mackey or anybody else. The Strawn Merchandise Company never did present me with an order."

Does the evidence so detailed support the verdict of the jury, or does it bring this case within the operation of the statute of frauds? In so determining, we must, of course, in accord with a well-settled rule, adopt the testimony most favorable to appellee. Mr. Williston, in his work on Contracts (volume 1, § 462), enumerates different tests that have been suggested by the courts to determine when a promise is within the statute. He there says:

"The most commonly suggested tests are:
"(1) A promise which is in form a guaranty performable only on default by a principal debtor is within the statute. A promise not in this form is not within the statute.
"(2) A promise which is in terms to pay a debt of another for which that other continues liable is within the statute; otherwise it is not.
"(3) The governing distinction is the purpose of the promisor whether to gain an advantage for himself or to secure it for another.
"(4) A promise which amounts in substance to a promise to pay the debtor's own debt is said to be within the statute; but otherwise if the promise is to pay the debt of another.
"(5) Whether a new and beneficial consideration has been received by a new promisor is made vital.
"(6) A test quoted in recent English cases with approval is laid down in a note to Williams' Saunders Reports, making the applicability of the statute depend 'not on the consideration for the promise but on the fact of the original party remaining liable, coupled with the absence of any liability on the party of the defendant or his property, except such as arises from his express promise.'
"(7) The test which it is submitted is the accurate one, is whether a promisor is, to the actual or presumed knowledge of the creditor, a surety; if so, his promise is within the statute.
"These tests obviously overlap one another, but they are not identical."

[1] The test, however, approved by the Texas decisions, is thus stated by Chief Justice Hemphill in the case of Lemmon v. Box, 20 Tex. 329:

"That wherever the main purpose and object of the promisor is, not to answer for another, but to subserve some purpose of his own, his promise is not within the statute, although it may be in form a promise to pay the debt of another, and although the performance of it may incidentally have the effect of extinguishing the liability of another."

The test so stated has been adopted and applied in many subsequent Texas decisions. See Muller v. Riviere, 59 Tex. 640, 46 Am. Rep. 291; McCreary v. Van Hook, 35 Tex. 631; Blakeney v. Nalle, 45 Tex. Civ. App. 635, 101 S. W. 875; Spencer & Co. v. Nalle & Co. (Tex. Civ. App.) 143 S. W. 991; Blakeney v. Nalle & Co., 45 Tex. Civ. App. 635, 101 S. W. 875; Stewart v. Stokes, 177 Mo. App. 390, 164 S. W. 156; Enterprise Trading Co. v. Bank (Tex. Civ. App.) 167 S. W. 296; American Freehold Land Mortgage Co. v. Brown (Tex. Civ. App.) 101 S. W. 856; Great Southern Oil & Refining Co. v. Cooper (Tex. Civ. App.) 231 S. W. 157. Other authorities also approve such test as a guide in a determination of whether the promise relied upon is within the statute. See Davis v. Patrick, 141 U. S. 479, 12 Sup. Ct. 58, 35 L. Ed. 826; Emerson v. Slater, 22 How. 28, 16 L. Ed. 360; Crawford v. Edison, by the Supreme Court of Ohio, 45 Ohio St. 239, 13 N. E. 80; 25 R. C. L. p. 494, par. 78.

[2, 3] By referring to the answers of the jury, it will be seen that the jury found that the appellant Housley agreed with the appellee's general manager that he would guarantee not only the future but the past account of Moore & Co., the condition of such guaranty being that the appellee would furnish such additional material as was necessary to complete his buildings; that in so doing the main purpose and intention of Housley was to subserve his own purpose and interest rather than to discharge and extinguish the liability of Moore & Co. The test adopted by the Texas decisions applied to the verdict of the jury undoubtedly supports the judgment in favor of appellee on the issue discussed, and in a case, as here, where the nature and effect of the promise relied upon does not depend alone upon the terms and language used, the question, we think, is one for the jury. 229 Am. & Eng. Ency. of Law (2d Ed.) 906; McGowan Commercial Co. v. Midland, etc., Co., 41 Mont. 211, 108 Pac. 655.

[4] It cannot be said, we think, that the evidence fails to support the verdict of the jury on the issue under discussion. It seems clear that the promise of appellant is sufficient to bind him for the payment of the value of all the material furnished in the construction of his buildings after the time when deliveries were refused to Moore & Co. There was evidence to the effect that after that time no further demands for payment were made upon Moore & Co. and that all

accounts and bills for material furnished were presented to appellant Housley, which as testified to by one of the witnesses in appellee's favor, were not denied by him. The question presenting some difficulty, perhaps, is whether appellant's promise was sufficient to bind him for paying the past indebtedness of Moore & Co., amounting to some $1,700; but, on the whole, we conclude that he is so bound. Ordinarily, an agreement to "guarantee" or "to stand for" the debt of another would, if unaccompanied with other facts leading to a contrary conclusion, import an agreement within the statute. But the use of such terms are not conclusive. In Williston on Contracts, § 465, it is said, among other things, that—

"Evidence that the original charge was to one person or the other, though strongly tending to prove the creditor's intention that the primary obligation should rest upon that person, is not conclusive; nor is the fact that a promise is called by the parties a guaranty conclusive that the promise is not original, though such is the natural meaning which will be given to the word if there are no controlling facts"—citing numerous cases in note to the text.

It is said in 20 Cyc. p. 1401, par. 2:

"The nature of the contract is not in general conclusively determined by the use of any particular form of words."

See, also, 25 R. C. L. p. 483, par. 65.

In the case of Davis v. Patrick, 141 U. S. 479, 12 Sup. Ct. 58, 35 L. Ed. 826, the Supreme Court of the United States applying the test adopted by the Texas courts held that Davis, who was interested in a mine, was liable to the plaintiff Patrick for an indebtedness that had accrued to the latter in hauling ores from the mine. The ruling was predicated upon the following testimony:

"I (the plaintiff Patrick) showed it (an account for past-due services in transporting ores) to Mr. Davis and told him I was not getting my money and Mr. Davis said my account was all right and he would be personally responsible to me for the money, and for me to go on as I had been doing and draw as little money as I could get along with to pay the men and the running expenses, and he would see that I got every dollar of my money."

The plaintiff's cashier, who was present at this conversation, gives this as his recollection of the conversation:

"Q. In that conversation state what Mr. Davis said about being responsible to A. S. Patrick for that account. A. He stated to Mr. Patrick in my presence that he would personally be responsible for that account. He says: 'You know, Al., I practically own this mine, but money is scarce and we must get what we can out of the mine.' He says, 'We are making large expenditures for improvements,' and he says, 'you shall have all the money you want to pay your men and expenses, but you must wait for the balance, and I will see that you are paid.'

"Q. What did he say in that connection to A. S. Patrick about continuing on in the hauling of the ores? A. He requested him to continue in the hauling of the ores. He requested him to do it.

"Q. In response to Mr. Davis to that request, what did Mr. Patrick say? A. He said to Mr. Davis if he would guarantee him to be paid he would continue to work, and Davis said he would see him paid."

Schoenfeld v. Brown, 78 Ill. 487, is a case where contractors furnishing material for building houses entered into a contract with another to furnish certain materials and the latter, after furnishing a small part, abandoned the contract on account of the insolvency of the principal contractor. The owner of the premises thereupon verbally promised to pay for the balance, and other materials were furnished on the faith of such promise. It was held that the promise to pay the balance was not within the statute of frauds.

A very similar case is that of Clifford v. Luhring, 69 Ill. 401. There the defendant had employed a party to build a house, and on his failure the plaintiff, who was a subcontractor, made known the fact to the defendant and informed him that he would be obliged to quit work, and the defendant thereupon told the plaintiff to go on with his part of the work and he would pay him. It was held that defendant's undertaking was not collateral but an original one, and not within the statute of frauds, his main object being to subserve an interest of his own.

In Brown v. Morrow, 124 Ark. 480, 187 S. W. 449, the Supreme Court of Arkansas, in disposing of the case, had this to say:

"In determining whether an oral promise is original or collateral, the intention of the parties at the time it was made must be regarded; and in determining such intention the words of the promise, the situation of the parties, and all of the conditions attending the transaction, should be taken into consideration. Millsaps v. Nixon, 102 Ark. 435, 144 S. W. 915. In the application of this rule, in Robinson & Son Contracting Co. v. Twin City Bank, 103 Ark. 219, 146 S. W. 523, the court held that a verbal promise by a principal contractor, that he would reimburse a certain bank for money advanced to a subcontractor upon time checks, issued by the subcontractor in completing the contract work, is not within the statute of frauds. The reason given was that the principal contractor was the beneficiary of the work done by the subcontractor, received pay for it, and in turn was liable to the subcontractor for the work done by him."

In the case of Crawford v. Edison, by the Supreme Court of Ohio, hereinabove cited, one S. agreed with C. to furnish the material and build him a house for a specified amount. S. employed E. to put on the roof, eave troughs, and conductor pipes for a stipulated sum, to be paid when the work should be completed. When E. had done about two-

thirds of the work, S. abandoned the job, and left the country, wihout having paid E., or provided for his payment. E. then informed C. that he would not do any more work, unless he was to be paid. Thereupon C. told E. to go on with his part of the work, and complete it, and he would pay him. E. accordingly completed his job, and charged the amount to C. It was held that C.'s promise was not collateral, to answer for the debt of another, but was an original one, for his own benefit, and unaffected by the statute of frauds.

So here, we think, the fact that Moore & Co. were not specifically released and discharged from the indebtedness due them. and the further fact that Housley used the terms "guarantee" or "stand for" the indebtedness of Moore & Co., is not conclusive. The evidence in behalf of appellee undoubtedly tends to show that appellant Housley was interested in having his buildings completed; that Moore & Co.'s financial responsibility was unknown to appellee's manager; that appellant without question received and applied the material furnished him for the completion of his buildings and other circumstances all tending to show, as the jury found, that Housley's main purpose was to subserve interests of his own and that the undertaking to insure payment of past due indebtedness of Moore & Co. was but an incident of his promise—a part of the consideration for appellee's undertaking to furnish additional material and thus accomplish the object appellant had in view. Hence, we conclude, without further discussion, that appellant's defense of the statute of frauds cannot be applied in his favor.

It follows that it is unnecessary to discuss and determine the questions raised by appellee's pleadings and contentions that from the evidence and verdict of the jury appellant is also liable on the ground of estoppel, and because of such changes in the contract between him and the contractors Moore & Co. as to amount to an abandonment of that contract and constitute appellant as the real owner and obligor and Moore & Co. as his servants or agents. Nevertheless, it may not be inappropriate to say in passing that the changes from the original plans, as shown by the evidence, consisting principally of changes made at appellant's request in the height of doors, width of windows, size of glass, covering of the roof, substitution of cement mortar instead of lime water for the brick work, etc., were but minor incidents of the buildings as a whole, and we are not inclined to adopt appellee's contention that appellant is liable on the ground of an abandonment of the contract with Moore & Co.

As to the issue of estoppel, it rests upon the fact and finding of the jury that appellee forebore to fix a materialman's lien, but this, it seems, could be effective as an estoppel only to the extent of the material furnished after appellant's promise. Nor can appellant's liability be predicated upon his failure to give bond as required by article 5623a, Rev. Statutes 1918, Sup., in view of the holding of our courts that such requirement cannot be constitutionally made. See Hess v. Denman (Tex. Civ. App.) 218 S. W. 162; Williams v. Baldwin (Tex. Com. App.) 228 S. W. 554. However, several other minor and subsidiary questions are presented by appellant's assignments and propositions that require determination which we will notice briefly.

[5] Appellant insists that the court erred in admitting appellee's verified account over his objection, the contention being that it had been denied under oath. But we think the contention must be overruled for the reason that by reference to the verification quoted in an earlier part of this opinion, it will be seen that it does not deny the accuracy of the several items in the account, but rather, in effect, that the account did not constitute a debt as against appellant, and that as to him therefore it was not just or true, thus harmonizing with his main contention that the case is within the statute of frauds and hence that the debt rests upon the obligation of Moore & Co. alone. Moreover, Moore & Co. made no denial of the accuracy of the account, nor did appellant when it was presented to him, and there was additional evidence tending to show that the items of the account were made out on triplicate slips as the material was delivered, one of which was forwarded to appellee's office, from which the account was made up, and another sent to Moore & Co. in the beginning and later to appellant. So that, we think the account, verified as it was, in the light of the entire record, constitutes at least prima facie evidence of its accuracy.

[6] Appellant also assigns error to the action of the court in overruling his motion to strike out the testimony of J. B. Moore, Sr., as to the value of the extra material and labor sued for by the defendants Moore & Co. in their cross-action. While it is made to appear that the testimony of J. B. Moore, supporting the accuracy of the several charges made in his cross-action, rested in part at least upon reports made to him by his foreman, it further appears that Moore was a contractor and expert builder with large experience, and that he personally saw at least a part, if not all, of the changes made in construction and in the material furnished, thus qualifying him, we think, as an expert to give his opinion on the values entering into his account for extras, particularly in view of the fact that there is no countervailing proof tending to question or weaken the testimony of Moore. Special exceptions also to Moore's testimony relating to these items were taken, but they are numerous, the bills of exception relating thereto in many instances greatly modified by ex-

planations of the trial judge, and the exceptions having relevancy, we think, go to the weight of the testimony rather than to its admissibility, the assignments relating thereto are accordingly overruled.

Other incidental questions will not be noticed, and we finally conclude that all of appellant's assignments of error and propositions must be overruled and the judgment affirmed.

### On Motion for Rehearing.

Counsel for appellant presents a motion for rehearing, alleging error to the overruling of the numerous assignments contained in his brief, and further urges with much force and plausibility that our conclusion on the issue of the statute of frauds is erroneous and in conflict with the numerous decisions cited, including Williams v. City National Bank, 166 S. W. 130, and Porter v. Norman, 136 S. W. 1173, both by this court, and which it is suggested we must have overlooked or intended to overrule without discussion "on account of sentimental feeling for its offspring." We regret that the able counsel so intimating has done himself the ethical and professional injustice of entertaining and expressing the thought embodied in the words above quoted. He insists that the case before us cannot be distinguished from those referred to and other cases he cites. But on original hearing we in fact considered our own cases as well as many others, and concluded, however erroneously, that they were distinguishable. And undertaking to discuss and distinguish all of the cases on the subject would be unprofitable and hopeless, for it must be conceded that they are not to be easily reconciled. But we will take the time to note that in the Williams Case, above, it appeared, and was distinctly so stated in the opinion, that Williams' promise "was conditional on the failure of Cowan Bros. (the original or promising debtors) to pay and therefore was collateral." The evidence showed "that the only promise Williams made was that he would pay the account if Cowan Bros. did not so do." In the Porter v. Norman Case, supra, we reverse the judgment below on the ground that the court's charge authorized the verdict against Porter even though he did no more, as he testified in effect, than orally agree to guarantee or secure payments for which others were primarily bound. The case of Brown v. F. & M. Bank, 88 Tex. 350, 31 S. W. 285, 33 L. R. A. 359, also urged, will disclose upon a careful reading that the oral promise of Brown, held to be within the statute, contemplated first a resort to and failure of the promising obligor. In other words, the promise was not absolute but clearly collateral. Brown in promising received no profit nor served any purpose of his own other than to favor a relative. Nor does it appear that Brown's promise was supported by a consid-

eration, a necessary element in every binding contract. It is also to be noted that the decision was against Brown on a different ground and but brief notice given the statute of frauds. We submit that the cases mentioned are easily distinguishable from the one before us. It may be true, and doubtless is true, that cases may be found, and are perhaps cited, that are not easily distinguishable or even in conflict; but it is a well-established doctrine that cases arising under the statute of frauds are determinable by the particular circumstances of the case, and in the one now before us we originally concluded, and yet think, that the circumstances warrant the conclusion reached by the court below that appellant's promise was substantially a direct one and not collateral to the obligation resting upon the firm of Moore & Co. It is to be borne in mind that appellant's buildings at the time of his promise were unfinished; that he desired their completion for business purposes; that appellee had positively refused to furnish Moore & Co. the necessary material; that thereupon appellant upon a conference with the agent of the appellee company promised to pay for such additional material as he needed. The promise to so do, regardless of the form of the words, which are not necessarily controlling, as we pointed out in our original opinion, was apparently direct, absolute, and not collateral. At least, we think the evidence warranted such a conclusion. Thereafter the account for the material furnished was presented to appellant alone for payment. There was evidence that appellant acknowledged liability thereon; that no further demand was again made against Moore & Co., although such company was not formally released. The evidence does not disclose that appellant could as readily and as advantageously procure the necessary material from others at the time and place. Hence we originally concluded, and are yet of the opinion, that the verdict, evidence, and judgment warranted the conclusion that must be imputed to the proceedings in the trial court that appellant's promise was upon a sufficient consideration, was original and absolute, and not collateral and within the statute of frauds, and such conclusion, we think, is not to be limited merely to the additional material received by appellant after his promise. We do not think the promise is so separable or was so understood by either party thereto at the time. The inclusion of the past indebtedness of Moore & Co. was but collateral to and an incident of the principal promise in effectuating the purpose and benefit appellant had in view. It was but a factor—a part—an element of the contract and consideration advanced by appellant for the undertaking of the appellee company to forthwith advance the necessary building material. If we are to consider, as we think

must be done, all reasonable inferences to be drawn from the verdict and from the evidence most favorable to the appellee company, it may be further said that there is nothing to show that the appellee company would have waived its right of weekly payment under the contract with Moore & Co. and furnished appellant the requisite building material upon credit as it did, in the absence of an understanding at the time that appellant was to pay not only for the material to be furnished, but also that they had already furnished. This perhaps appears the more reasonable in that there was evidence tending to show that appellant at the time stated that he was indebted to Moore & Co. in a sum sufficient to meet the past-due indebtedness, and appellee omitted to take steps to fix a materialman's lien.

Without further discussion, however, the motion for rehearing will be overruled.